## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

April Bezdichek,

        Plaintiff,

v.

Hilton Hotels Corporation d/b/a
HHC-Hilton Minneapolis H&T, and
James M. Vennewitz,

        Defendants.

Court File No. 08-6196 (MJD/JSM)

**DEFENDANTS' MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff April Bezdichek brought the instant eight count lawsuit against Defendants, Hilton Hotels Corporation ("Hilton"), her former employer, and James M. Vennewitz, (collectively referred to herein as "Defendants"), a former management employee. Bezdichek alleges sex discrimination and reprisal under the Minnesota Human Rights Act together with five common law claims because she asserts Vennewitz made inappropriate comments and contact with her during her employment that ultimately forced her to resign. Essentially, Bezdichek complains of a non-existent "orgy", excessive alcohol consumption with her supervisor, and occasional innocuous remarks. However, the undisputed facts show Vennewitz did not subject her to unwelcome conduct nor did his actions, or those of Hilton, force her to resign. Rather, she resigned to move to California to live with her boyfriend. For the reasons set forth below, the Court should dismiss Plaintiff's Complaint in its entirety.

## STATEMENT OF FACTS

### I.    BACKGROUND ON THE PARTIES.

Bezdichek formerly worked for Hilton Minneapolis, a downtown hotel, in the Food and Beverage Department.  (Sec. Am. Compl. ¶¶ 1, 3, 5).  Bezdichek worked as an on-call cocktail server and quit her employment on October 15, 2007 to live in California with her boyfriend. [1] (Bezdichek Dep. 152-53).  James Vennewitz was the Assistant Food & Beverage Director at the hotel but not Bezdichek's immediate supervisor.  (Vennewitz Dep. 11, 13, 15, 19).

### II.   BEZDICHEK'S EMPLOYMENT WITH HILTON.

Thompson interviewed and hired Bezdichek as an on-call server on October 25, 2005.  (Bezdichek Dep. 34, Bezdichek Ex. 20; Thompson Dep. 67).  As an on-call server, Bezdichek worked in the SkyWater Lounge serving cocktails and related items to bar patrons and hotel guests.  (Bezdichek Dep. 33; Bezdichek Ex. 19).  At the time of her hire, Bezdichek received Hilton's new hire orientation, its Team Member Handbook and acknowledged its Harassment-Free Workplace Policy.   (Bezdichek Exs. 22-23).  Bezdichek acknowledged Hilton's Harassment-Free Workplace Policy two other times later in her employment and admits she knew of her obligation to report issues of sexual

---

[1]The deposition transcripts and relevant exhibits cited herein are attached to the Declaration of Thomas E. Marshall, Esq. ("Marshall Decl."), submitted in support of this Motion.  For ease of review, the deposition transcript pages of the witnesses cited herein (Bezdichek (Marshall Decl. Ex. A), Vennewitz (Marshall Decl. Ex. B), Smith (Marshall Decl. Ex. C), and Schultz (Marshall Decl. Ex. D)) are referenced herein with the deponent's last name and corresponding page number ("Name Deponent ##").   Any exhibits referenced herein correspond to the deposition exhibit and is cited with the deponent's last name and the exhibit number ("Deponent Ex. ##").

harassment.  (Bezdichek Dep. 44-45; Bezdichek Exs. 24, 33, 35-36).

## III.    BEZDICHEK'S INTERACTION WITH VENNEWITZ.

### A.    The Chambers Hotel Incident.

Bezdichek generally worked late hours but on occasion she would see Vennewitz, who usually worked day shifts, at work.  (Bezdichek Dep. 54, 73).  Bezdichek alleges Vennewitz made comments such as "her butt looked good" in her hotel uniform. (Bezdichek Dep. 65).   Bezdichek initially considered Vennewitz's comments complimentary. (Bezdichek Dep. 72).

One evening, Bezdichek and another co-worker, planned to go to the new Chambers Hotel for drinks after work.  (Bezdichek Dep. 64).  Vennewitz went with Bezdichek to the Chambers that evening.  (Bezdichek Dep. 64).  The Chambers was managed by a former Hilton manager.  (Bezdichek Dep. 77-78).  During their visit, the former manager provided complimentary drinks to Vennewitz and he drank more than he should have.  (Bezdichek Dep. 78).  Later in the evening, the group received a tour of the hotel and in one room there was an opaque screen separating the room.  (Bezdichek Dep. 81-83).  The former manager suggested Bezdichek and her co-worker dance behind the screen so they could watch their outlines.  (Bezdichek Dep. 83).   According to Bezdichek, Vennewitz suggested they dance nude.  (Bezdichek Dep. 85).  Bezdichek and her co-worker did not comply with the request.  (*Id.*).

As the evening wore on, Bezdichek planned to spend the night at her co-worker's apartment, who lived near downtown.  (Bezdichek Dep. 90-91).  Because Vennewitz had too much to drink, he also went to the apartment.  (Bezdichek Dep. 92).  After arriving,

Bezdichek removed her outer clothing and put on a sweatshirt and sweat pants owned by her co-worker, together with her own undergarments. (Bezdichek Dep. 96-97). Bezdichek soon retired to bed in her co-worker's bedroom. (Bezdichek Dep. 94-95). Vennewitz and her co-worker remained in the living room of the apartment. (*Id.*). Sometime later, Bezdichek alleges she awoke to find Vennewitz in bed with her attempting to reach his hand under her bra. (Bezdichek Dep. 97). Bezdichek claims she asked Vennewitz what he was doing and immediately left the bedroom. (Bezdichek Dep. 98). Bezdichek went to sleep on a couch in the living room where her co-worker was sleeping. (Bezdichek Dep. 97). Vennewitz did not follow her. (Bezdichek Dep. 99).

When Bezdichek awoke in the morning, Vennewitz was gone. (Bezdichek Dep. 97). Bezdichek and Vennewitz never spoke about the incident after that evening. (Bezdichek Dep. 101-02). Vennewitz, due to his heavy drinking, has no recollection of the event. (Bezdichek Dep. 102). Bezdichek states that not long after that evening, while cutting fruit in Thompson's office, she mentioned to Thompson that she and Vennewitz had gone to the Chambers Hotel and that Vennewitz had also slept at the co-worker's apartment. (Bezdichek Dep. 104).

### B.   The "Orgy".

At the end of August 2007, Hilton held a conference with sales personnel from other parts of the country. (Bezdichek Dep. 172). On the last night of the conference, Hilton General Manager, John Luke, held a champagne toast for the management staff in the Boardroom (a meeting room at the hotel) to congratulate them on a job well done. (Vennewitz Dep. 30). After Luke left, some of the staff took the opportunity to celebrate

further.  (*Id.*).

In a nearby ballroom, the sales conference attendees had a dance with a live band. (Bezdichek Dep. 179).  Several of Hilton management personnel brought liquor from the dance into the Boardroom.  (Bezdichek Dep. 181).  An impromptu party ensued, which continued into the early hours of the morning.  (Vennewitz Dep. 30).  Vennewitz, Thompson, their supervisors, and others were at this party.  (Vennewitz Dep. 29-30).  According to all who attended the event, aside from drinking and some off-color comments, nothing inappropriate happened at the party.  (See Affidavits of Managers)[2]

Shortly before 1:00 a.m., SkyWater Restaurant/Lounge evening manager, Debra Smith, came into the Boardroom and made a loud sarcastic comment about when she could close the SkyWater lounge.[3]  (Vennewitz Dep. 33).  Smith's comment insulted the Food and Beverage Director, Victor Salomone, who soon left the room to speak with Smith about her conduct.  (Vennewitz Dep. 35).   Bezdichek was not present for their meeting.   (Bezdichek Dep. 203).   Smith states she saw a couple of  managers inappropriately touching  unidentified females while all were fully clothed.  (Smith Dep. 141-42).  However, according to Bezdichek, Smith saw nothing and it was she who told Smith about what happened in the Boardroom.  (Bezdichek Dep. 166-69, 215-16; Smith Dep. 141-43).

Bezdichek was not working on the last night of conference. (Bezdichek Dep. 172).

---

[2] See Declarations of Tracie Schultz, Matt Renneberg, Dan Truniger, Victor Salomone, Kim Thompson, Paul Downing, Kristin Martin, Heather Hugghins, Gretchen Jorgenson and Kristin Erdmann filed herein.

[3] From security videos, Smith was in the room approximately eight seconds.

Bezdichek voluntarily came to the hotel for the party after Vennewitz called and invited her. (Bezdichek Dep. 173). With Vennewitz's approval, Bezdichek also brought a friend to the party. (Bezdichek Dep. 176).

Bezdichek arrived at the party sometime after 1:00 a.m. with a friend. (Bezdichek Dep. 169, 208). Bezdichek went up to the Boardroom. (Bezdichek Dep. 177-79). Bezdichek described Vennewitz as being drunk. (Bezdichek Dep. 206-07). She claims he pulled her on to his lap, bounced her up and down several times on "his erect penis." (Bezdichek Dep. 184).[4] Bezdichek also states that another Hilton manager was leaning over a woman on a table simulating sexual contact while both were fully clothed. (Bezdichek Dep. 182, 190-91, 216). Another manager was apparently rubbing himself over a woman while fully clothed. (Bezdichek Dep. 238-39). Bezdichek did not participate in any of these contacts. (Bezdichek Dep. 207).

Bezdichek left Vennewitz stating she had to go outside to smoke. (Bezdichek Dep. 186-87). After smoking, she returned to the Boardroom area and found Vennewitz getting on an elevator. (Bezdichek Dep. 189). Vennewitz said "come on Bez" implying he wanted her to come up to a hotel room where he was going to stay. (Bezdichek Dep. 188-89, 211). This occurred around 2:15 a.m. (Bezdichek Dep. 196, 211). She declined and Vennewitz left. (Bezdichek Dep. 189).

## IV.   HILTON'S INVESTIGATION.

A day after the Boardroom party, Hilton General Manager Luke learned that some food and beverage staff members had been heavily drinking and made some

---

[4] Vennewitz denies this and no witness corroborates this event.

inappropriate comments that evening.  (Schultz Dep. 28).  Luke instructed the Human Resources Department to investigate the event.  (Schultz Dep. 29).  Human Resources was also investigating potential discipline against Smith for her inappropriate conduct the night before as reported by Salomone.  (Schultz Dep. 25).  Schultz investigated these reported events.  (*Id.*).

When asked during the investigation, Smith did not mention any inappropriate sexual conduct.  (Schultz Dep. 37).  Smith merely suggested they talk to Bezdichek because she had told Smith of the elevator invitation Vennewitz made to her.  (Schultz Dep. 44-45).  Schultz contacted Bezdichek who stated that she "liked" Vennewitz, and did not consider his conduct sexual harassment.  (Bezdichek Dep. 212; Schultz Dep. 45-46; Schultz Ex. 6).  Bezdichek denies that she said she liked Vennewitz.  (Bezdichek Dep. 212).  The next day Bezdichek called Human Resources worried that she might have said too much, as she implicated two other employees who had left work and consumed alcohol during their lunch hour.  (Bezdichek Dep. 218-19; Bezdichek Ex. 38).  Bezdichek testified that Vennewitz never threatened her employment, never promised her any promotions, and never made any specific verbal suggestion that he wanted to have a sexual relationship with her.  (Bezdichek Dep. 222).  As a result of the investigation, Hilton reprimanded all of the management employees who participated in the party, including Vennewitz, Thompson, and Salomone.  (Vennewitz Dep. 40; Thompson Dep. 10; Schultz Dep. 76).

## V.     BEZDICHEK RESIGNS TO MOVE TO CALIFORNIA.

By the time Hilton concluded its investigation and issued the discipline, Bezdichek had left Minnesota and moved to California with her boyfriend.  (Bezdichek Dep. 152-53, 225).  Bezdichek returned one weekend in October and worked at Hilton but thereafter, permanently moved to California.  (Bezdichek Dep. 152, 158).  Bezdichek obtained a job in a California physician's office within one month of her leaving Minneapolis, making more money than she had made at Hilton. (Bezdichek Dep. 8, 12). She has not sought or received any psychological treatment and, aside from some sleeplessness, has not suffered any ill effects from her Hilton experience.  (Bezdichek Dep. 239-40).

## <u>STANDARD OF REVIEW</u>

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (*quoting* Fed. R. Civ. P. Rule 1). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[S]ummary judgment is appropriate when a plaintiff fails to establish a factual dispute on an essential element of her case." *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1205 (8th Cir. 1997); *Wilking v. County of Ramsey*, 153 F.3d 869, 872 (8th Cir. 1998).

## LEGAL ARGUMENT

I.   **BEZDICHEK HAS NOT PRESENTED SUFFICIENT EVIDENCE TO SUPPORT A SEX HARASSMENT CLAIM.**

Bezdichek alleges in Count One that she was "subjected to unwelcome sexual conduct[ed] directed at her on the basis of her sex.  These actions constitute differential treatment because of sex."  (Sec. Am. Compl. ¶ 14).  Sexual harassment consists of "sexually motivated physical contacts, sexually derogatory statements and verbal sexual advances."  *Continental Can Co., Inc. v. State*, 297 N.W.2d 241, 249 (Minn. 1980). A hostile work environment exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive" to alter the terms and conditions of employment. *See Merwether v. Caraustar Packaging Co.,* 326 F.3d 990, 993 (8th Cir. 2003).

To establish a claim for sexual harassment under the Minnesota Human Rights Act ("MHRA"), Bezdichek must show she was subjected to unwelcome sexual conduct that affected a term, condition, or privilege of employment.  *See Danz v. Jones*, 263 N.W.2d 395, 398-99 (Minn. 1978); *Sigurdson v. Isanti Cty*, 386 N.W.2d 715, 719 (Minn. 1986); *Goins v. West Group*, 635 N.W.2d 717, 725 (Minn. 2001); *Stuart v. GMC*, 217 F.3d 621, 631 (8th Cir. 2000).[5]  Bezdichek cannot establish she suffered from a hostile work environment as a matter of law and therefore, her claim should be dismissed.

---

[5] Claims under the MHRA are analyzed similarly to claims for Title VII except that under the MHRA, the plaintiff has an additional burden of establishing that the conduct she was subjected to was unwelcome "*sexual conduct*." *See Danz*, 263 N.W.2d at 398-99; *Sigurdson*, 386 N.W.2d at 719; *Goins*, 635 N.W.2d at 725.

### A.    Bezdichek Cannot Establish The Alleged Conduct Was Unwelcome.

Bezdichek alleges Vennewitz made two inappropriate comments and attempted to touch her breasts in support of her harassment claim.  (Bedzichek Dep. 65, 85, 97). This conduct is not sufficient to defeat summary judgment.   First, Bezdichek's claim Vennewitz suggested she dance behind a screen in a hotel room, and that Vennewitz complimented her on the way she looked, (Bedzichek Dep. 65, 85) is not enough to establish harassment.   The alleged breast touching occurred after a night of drinking at Chambers Hotel where Vennewitz reached the point of passing out. (Bedzichek Dep. 92, 94). The same circumstance exist for the sales conference party.  (Bedzichek Dep. 206-07). Although these allegations may potentially be perceived as inappropriate, they represent "offhanded comments and isolated incidents [which] are insufficient to create actionable harassment" and are instead, the type that are "merely tinged with offensive sexual connotations." *See Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (*quoting Oncale*, 523 U.S. at 81).

Furthermore, the evidence does not establish the actions were unwelcome. It is undisputed Bezdichek voluntarily socialized with Vennewitz and mutual friends at the Chambers Hotel and even after that evening, she voluntarily attended the food and beverage department's party on August 30th after Vennewitz invited her. (Bezdichek Dep. 64, 173). Furthermore, Bezdichek asserts she believed Vennewitz's comments about her appearance were complimentary.   (Bezdichek Dep. 72). These facts do not infer unwelcome behavior.

**B.     Bezdichek Fails To Present A Triable Issue of Fact to Show The Alleged Harassing Conduct Affected a Term, Condition, or Privilege of Employment.**

Bezdichek's claim further fails because there is no evidence to establish the alleged harassing conduct affected a term, condition, or privilege of her employment.  In analyzing this element of harassment, courts consider the following factors:

- the frequency and severity of the discriminatory conduct;
- whether it is physically threatening or humiliating or only an offensive utterance;
- whether it unreasonably interferes with the employee's work performance, physical proximity to the harasser; and
- the presence or absence of other people.

*Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999) (internal citations omitted). These standards should be applied to ensure only conduct that is "extreme" will be deemed to amount to a change in the terms and conditions of employment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

### 1.     The Alleged Behavior Was Not Frequent or Severe.

There is no evidence the conduct was frequent or severe – to the contrary, it occurred on only two occasions in the two years she worked at Hilton.  *See Alagma v. Smithville R-II*, 324 F.3d 975 (8th Cir. 2003) (finding a male's inappropriate behavior towards a female colleague extending beyond two years and including behavior such as saying "I love you", commenting on the colleague's appearance, calling her repeatedly at her home, physically touching her, giving her gifts such as romance novels was not severe or pervasive); *see also Duncan v. GMC*, 300 F.3d 928, 931-35 (8th Cir. 2002) (finding no severe or pervasive harassment where for three years, a female employee was

subject to inappropriate behavior such as a co-worker propositioning her for a relationship, physical contact, visible pornography, poster depicting the plaintiff in a negative manner). Furthermore, the incidents happened while both parties were not working but socializing and Vennewitz was drinking heavily.

### 2. The Conduct Was Not Physically Threatening or Humiliating.

To be actionable, Bezdichek must also establish the alleged conduct was physically threatening or humiliating and not just an occasional offensive utterance. *See Carter,* 173 F.3d at 702. Here, there is no allegation of physical threats or even a threat to her employment. To the contrary, after Vennewitz *attempted* to put his hand under her bra and Bezdichek confronted him, the conduct did not happen again. (Bezdichek Dep. 61-62). To be sure, she voluntarily attended the party of August 30th at Vennewitz's request. (Bezdichek Dep. 173). Even Vennewitz's suggestive comment of "come on Bez" when he was getting in the elevator cannot show a physical threat or humiliation. (Bezdichek Dep. 211). Bezdichek simply denied his request and went back to the party. (Bezdichek Dep. 189, 197). No evidence exists to suggest the events on these two nights were anything more than an offensive utterance and circumstance. It cannot support a harassment claim.

### 3. The Alleged Behavior Did Not Interfere With Bezdichek's Working Conditions or Performance.

Furthermore, Bezdichek cannot establish the alleged harassing conduct interfered with her working conditions or performance. Bezdichek disingenuously argues in her Complaint that after she allegedly reported the behavior to Thompson, Hilton did not call

her for shifts and shunned her, which ultimately forced her to resign. (Sec. Am. Compl. ¶ 11). However, the facts do not support her claim. Rather, when Schultz investigated Vennewitz's conduct, Bezdichek did not report harassing behavior. (Bezdichek Dep. 152, 158; Schultz Dep. 45-46). Bezdichek worked at Hilton until she visited her boyfriend in California in September 2007 and thereafter, decided to move there permanently to be with him. (Bezdichek Dep. 152-53, 157-58, 220). Hilton did not cut her hours. Rather, she was unavailable to work based on her travel.

Furthermore, Bezdichek cannot establish she was "constructively discharged." Rather, she voluntarily moved to California to be with her boyfriend and still lives there today. (Bezdichek Dep. 152-54, 158). In order to establish a constructive discharge, Bezdichek must prove each of the three distinct elements: 1) her working conditions were so objectionable that a reasonable person would have deemed resignation as the only plausible alternative (judged by an objective standard); 2) Defendant deliberately created intolerable working conditions with the *intent* of forcing her to quit; and 3) a discriminatory attitude was a motivating factor in Defendant's decision. *See Tatom v. Georgia-Pacific Corp.*, 228 F.3d 926, 932 (8th Cir. 2000) (emphasis added); *Spears v. MO Dep't of Corrections & Human Resources*, 210 F.3d 850, 854 (8th Cir. 2000); *Gartman v. Gencorp, Inc.*, 120 F.3d 127, 130-31 (8th Cir. 1997). Bezdichek cannot assert any facts to establish her claim of constructive discharge.

Here, a reasonable person would not have deemed resignation the "only plausible alternative" based on Vennewitz's alleged inappropriate acts, even if true. Bezdichek could have reported the actual conduct she believes was harassing, but chose not to.

Even when Schultz contacted Bezdichek about Vennewitz at Smith's suggestion, Bezdichek told Schultz that she "liked" him and did not consider his conduct sexual harassment. (Schultz Dep. 45-46). Furthermore, there is no evidence Vennewitz, or any management employee of Hilton, wanted Bezdichek to resign or that Vennewitz had a discriminatory attitude towards her. By all accounts, the two voluntarily socialized with each other and had no problems working together. (Bezdichek Dep. 64, 173).

Bezdichek fails to adduce evidence to establish constructive discharge. Whether working conditions are intolerable is judged by an objective standard. *Tatom*, 228 F.3d at 932. This standard requires working conditions be so objectionable that a reasonable person would deem resignation the *only* possible alternative. *Id.*

As a reasonable person, Bezdichek had a duty to give Hilton the opportunity to resolve any problems. An employee who quits "without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged." *Duncan v. GMC*, 300 F.3d 928, 935 (8th Cir. 2002) (*quoting Summit v. S-B Power Tool*, 121 F.3d 416, 421 (8th Cir. 1997); *see also Jaros v. LodgeNet Entm't Corp.*, 294 F.3d 960, 965 (8th Cir. 2002) (stating that in order for an employee to establish that she was constructively discharged she must have given her employer a reasonable opportunity to fix the problem). Bezdichek is "***not to assume the worst and not to jump to conclusions too fast***." *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir. 1995) (emphasis added) (internal citation omitted).

In *Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir. 2002), the Court refused to find constructive discharge based, in part, on the fact that the employee did not

complain of the alleged harassment for over nine months and once she did, resigned before submitting her written allegations to management and before management had the information necessary to initiate any of the suggested corrective actions from the plaintiff. (*Id.*). Here Bezdichek did not report any offensive conduct until approached by Hilton's Human Resources Department in September 2007. (Bezdichek Dep. 212; Schultz Dep. 45-46; Schultz Ex. 6). Before any investigation was completed, she left Minnesota permanently, returning only for one weekend's work in October. (Bezdichek Dep. 152-53, 225). Furthermore, all of the managers, including Vennewitz and Thompson, received discipline for their participation in the August party. (Vennewitz Dep. 40; Thompson Dep. 10; Schultz Dep. 76).

Because the evidence shows Bezdichek voluntarily left Hilton to move to California, she cannot establish the alleged harassment affected a term or condition of her employment or that she was constructively discharged. For the reasons set forth above, the Court should dismiss Bezdichek's claim for sex harassment as a matter of law.

## II.   BEZDICHEK'S REPRISAL CLAIM MUST BE DISMISSED.

Bezdichek further alleges that after "engaging in protected activity," Hilton responded by not scheduling her for shifts and ultimately causing her constructive discharge. (Sec. Am. Compl. ¶¶ 28-31). To survive summary judgment on a reprisal claim, Bezdichek must establish: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse action. Minn. Stat. § 363A.15; *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 101 (Minn. 1999); *Hubbard v. United Press Int'l, Inc.,* 330

N.W.2d 428, 444 (Minn. 1983); *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir.

2007).  Bezdichek's claim fails because, as stated above, there is no evidence Bezdichek

reported the alleged conduct or suffered an adverse employment action.

Here, Bezdichek failed to participate in Schultz's investigation regarding

Vennewitz. (Schultz Dep. 45-46).   When Schultz spoke to Bezdichek, she denied

Vennewitz had acted inappropriately.  (*Id.*).  Bezdichek has not asserted facts to show she

engaged in protected activity.  Furthermore, as stated above in Section I.B.3, there are no

facts to establish she suffered an adverse employment action. The Court must dismiss her

reprisal claim as a matter of law.

## III.  BEZDICHEK'S COMMON LAW CLAIMS ARE PREEMPTED BY THE MINNESOTA WORKERS' COMPENSATION ACT.

Bezdichek asserts six common law claims in her Second Amended Complaint:

negligent infliction of emotional distress (Count III); negligent retention (Count IV);

battery (Count V); invasion of privacy (Count VI); assault (Count VII); and intentional

infliction of emotional distress (Count VIII), (hereinafter referred to as "the common law

claims" unless specifically referenced otherwise).  The Court must dismiss the common

law claims because any injury sustained by Bezdichek as a result of Defendant

Vennewitz's alleged physical conduct is compensable solely through the Minnesota

Workers' Compensation Act ("Minnesota WCA"). *See* Minn. Stat. § 176.031(1994); *see

also McGowan v. Our Savior's Lutheran Church*, 527 N.W.2d 830 (Minn. 1995) (finding

the plaintiff's negligence action was barred by the exclusive remedy provision of the

Minnesota WCA).

The Minnesota WCA requires employers to pay compensation in cases where an employee sustains personal injury arising out of and in the course of employment without regard to the question of negligence. *McGowan*, 527 N.W.2d at 833; *see also Wise v. Digital Equip. Corp.*, 1994 Minn. App. LEXIS 1181 , No C9-94-461 (Minn. App. 1994) (holding plaintiff's claim that the employer was negligent in failing to take timely and appropriate action resulting in her sustaining mental injuries was preempted by the Minn. WCA). Under the Minnesota WCA, if an employee suffers a personal injury "arising out of and in the course of employment ... the Act provides the employee's exclusive remedy." *McGowan*, 527 N.W.2d at 833 (*citing* Minn. Stat. § 176.031 (1994)). As noted by the Minnesota Supreme Court, where the Minnesota WCA "provides the employee's exclusive remedy, the district courts have no jurisdiction." *Id.* (*citing Huhn v. Foley Bros.*, 22 N.W.2d 3 (1946)).

In analyzing the preemption issue, "the phrase 'arising out of' means that there must be some causal connection between the injury and the employment." *Foley v. Honeywell Inc.,* 488 N.W.2d 268, 271 (Minn. 1992). However "causal connection does not mean that the employment has to be the proximate cause of the injury." *Id. at* 271; *See Also St. Paul Fire & Marine Ins. Co. v. Seagate Tech. Inc.*, 570 N.W.2d 503, 507 (Minn. App. 1997). As noted in *Foley*, "the phrase 'out of' expresses a factor of **source or contribution** rather than the sense of being proximate or direct... . It is enough that the injury flows' as a natural incident of the work as a result of the exposure occasioned by the nature of the employment." *Id.* at 271 (*quoting Hanson v. Robitsheck-Schneider Co*., 209 Minn. 596, 598-99 (1941)) (emphasis added).

17

In this case, Bezdichek's injuries, assuming they occurred, are compensable solely through the Minnesota WCA because they stem from her employment relationship with Vennewitz and thus, Hilton.   To be sure, Bezdichek alleges Hilton's negligent supervision and retention of Vennewitz is the "cause" of her injuries.   Her own allegations directly support the conclusion that her alleged injuries "flow as a natural incident from her employment."   Bezdichek does not deny the alleged physical injuries occurred during her employment with Hilton and at the hands of Vennewitz – a mutual employee of Hilton.   *See generally*, *Foley*, 488 N.W.2d at 272 (Minn. 1992) (noting that regardless of whether the plaintiff was present at work for personal or business purposes, any unsafe conditions of the facility were associated with the plaintiff's employment).

For these reasons, the Minnesota WCA preempts the common law claims and Defendants are entitled to summary judgment on Counts III-VIII.

## IV.   IN THE ALTERNATIVE, THE COURT SHOULD DISMISS BEZDICHEK'S COMMON LAW CLAIMS AS THEY ARE PREEMPTED BY THE EXCLUSIVE REMEDIES PROVIDED UNDER THE MHRA.

Bezdichek's common law claims are factually supported only by Defendant Vennewitz's alleged conduct and Defendant Hilton's alleged inappropriate training, retention and supervision of Vennewitz.   (Sec. Am. Compl. ¶¶ 3-39).   These allegations are no different than those she asserts to support her harassment and reprisal claims under the MHRA *supra*.   (S*ee* Legal Sections I-II).   For this reason, the Court should dismiss her claims as they are preempted by the exclusivity provision of the MHRA.   *See* Minn. Stat. §363A.04 (1994); *See Also Sullivan v. Spot Weld. Inc.,* 560 N.W.2d 712, 717 (Minn. App. 1997).

The MHRA provides that: "as to acts declared unfair by sections 363A.08 and 363A.09 and 363A.28, subdivision 10, the procedure herein provided shall, while pending, be exclusive." *See* Minn. Stat. § 363A.04.  The Minnesota Supreme Court in *Williams v. St. Paul Ramsey Med. Ctr., Inc.*, 551 N.W.2d 483, 485-86 (Minn. 1996) explained that it was not the intent of the legislature that:

> employees seeking redress for allegedly discriminatory employment action could simultaneously maintain an action relating to the same allegedly discriminatory practice and predicated on identical factual statements and alleging the same injury or damages.  The language of the Act does not support such an interpretation and we decline to judicially fashion such relief.

Courts have interpreted the effect of the MHRA's exclusive remedy provision to preempt common law negligence causes of action arising from the same facts as a sexual harassment claim since the duty of an employer to remedy sexual harassment arises from the obligations set forth in the MHRA, and not from common law.  *Wise v. Digital Equip. Corp.*, 1994 Minn. App. LEXIS 1181, No. C9-94-461 (Minn. App. 1994) (holding that the plaintiff's negligence claims were not parallel with her sexual harassment claim but rather, identical and therefore, preempted by the MHRA).  At a minimum, courts have interpreted the MHRA's exclusive remedy provision to preclude double recovery for common law claims arising from the same operative facts as an MHRA claim.  *See Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374 (Minn. 1990).

In determining whether the MHRA preempts a common law cause of action, courts look at: 1) whether the "factual basis and injuries supporting the common law claim also would establish a violation of the MHRA, and 2) whether the obligations the

defendant owes to the plaintiff as a practical matter are the same under both the common law and the MHRA." *Pierce v. Rainbow Foods Group*, 158 F. Supp. 2d 969, 976 (D. Minn. 2001).   Under this standard, Bezdichek's common law claims are all preempted by the MHRA because she asserts the same underlying facts to also support her harassment and reprisal claims – Vennewitz's alleged unlawful touching and Hilton's retaliatory acts of not scheduling, and ultimately causing her discharge, after she reported the conduct.

Preemption is also appropriate since Defendant Hilton's obligations under the MHRA and the common law are identical.  Specifically, Defendant Hilton has a statutory duty to prevent sexual harassment in the workplace and a common law duty to prevent employees from unreasonable risks of physical harm.  *See Pierce*, 158 F. Supp. 2d at 976. These duties are coextensive.  *Id.*  Accordingly, any injuries Bezdichek sustained are compensable only through the MHRA and this Court should dismiss Bezdichek's common law claims in Counts III through VIII.

## V.   ALTERNATIVELY, BEZDICHEK'S COMMON LAW CLAIMS ARE NOT VIABLE.

Even if this Court does not hold Bezdichek's common law claims are preempted by the Minnesota WCA or the MHRA, it should dismiss them because she has not presented sufficient evidence to support those claims.

### A.   Bezdichek's Negligence Claims Are Not Viable.

#### 1.   There Is No Evidence To Support A Negligent Retention Claim.

Count IV alleges Defendant Hilton is liable for injuries suffered by Bezdichek

under the theory of "negligent retention."  Minnesota courts find that:

> liability [for negligent retention] is predicated on the negligence of an employer in placing a person with known propensities or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment it should have been foreseeable that the hired individuals posed a threat of injury to others.

*Ponticas v. K.M.S. Invs.*, 331 N.W.2d 907, 910 (Minn. 1983).  Further, courts have noted that the claim of negligent retention is viable when "during the course of employment the employer becomes aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment."  *See Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 423 (Minn. App. 1993). These facts do not exist. To the extent Hilton discovered evidence to support Bezdichek's claims, despite her unwillingness to come forward with the information, the facts show Hilton did investigate and reprimand Vennewitz, and others, promptly and appropriately.

Some courts have recognized that a claim for negligent retention may be actionable when an employee is subject to sexual harassment.  *See Kresko v. Rulli*, 432 N.W.2d 764, 769 (Minn. App. 1988).   However, even in those cases, courts have repeatedly required some evidence of a "threat of physical injury or actual physical injury resulting from the harassment." *See Bruchas v. Preventive Care In*c., 553 N.W.2d 440, 442-443 (Minn. App. 1996); s*ee also Leidig v. Honeywell, Inc.,* 850 F.Supp. 796, 807 (D. Minn. 1994).  Bezdichek makes no allegations of a threat of physical "injury."  Rather, Bezdichek asserts Vennewitz touched her inappropriately twice, but she suffered no physical injury.

### 2.   Bezdichek's Claim for Negligent Supervision Likewise Fails.

Count IV also alleges Defendant Hilton is liable under the theory of "negligent supervision."  An employer can be found liable for negligent supervision under a theory of respondeat superior.  Minnesota courts have analyzed negligent supervision claims under Restatement (Second) of Agency § 213 and the Restatement (Second) of Torts § 317.  *See Bruchas*, 553 N.W.2d at 442-443.  To establish a claim for negligent supervision a plaintiff must prove:

1) The employee is on work premises or using employer's property;
2) The  employer has reason to know of its ability to control the employees;
3) The employer knows or should know control is needed; and
4) The employee physically injures the plaintiff.

*Semrad v. Edina Realty Inc.*, 494 N.W.2d 533 (Minn. 1992); *see also Bruchas,* 553 N.W.2d at 442-43; *Ponticas*, 331 N.W.2d at 910-11.  Bezdichek therefore must show that Defendant Hilton had notice that Defendant Vennewitz posed a risk of injury and yet failed to ensure her safety and the safety of others.  *Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 422 (Minn. App. 1994).  As stated above, such a claim is not supported by the record.

Defendant Vennewitz worked for Hilton for fifteen years without incident – there were no indications he could potentially pose a risk of injury to Bezdichek or others.  Furthermore, the evidence demonstrates Hilton did not fail to ensure the safety of its employees – it routinely provided training to its staff and managers and immediately investigated the complaint once the allegations were reported.  Finally, there is no evidence to suggest Defendant Vennewitz's alleged conduct was foreseeable or that

Bezdichek sustained physical injuries.   For these reasons, the Court should dismiss

Bezdichek's claim for negligent supervision.[6]

> **B.      Bezdichek's Battery and Assault Claims Are Not Viable.**

Bezdichek alleges in Counts V and VII that Defendants Hilton and Vennewitz are

liable for injuries she suffered under the theories of battery and assault.   An actionable

claim for battery "requires a showing of offensive or harmful contact **along** with the

defendant's **intent** to cause such contact."  *Pierce v. Rainbow Foods Group*, 158 F. Supp.

2d 969 (D. Minn. 2001) (*citing Essex Ins. Co. v. Davidson*, 248 F.3d 716, 718 (8th Cir.

2001) (emphasis added)); *Johnson v. Morris*, 453 N.W.2d 31, 40 (Minn. 1990).   A claim

of assault involves an unlawful threat of bodily harm and the ***present ability*** to carry out

the threat.  *Adewale v. Whalen*, 21 F. Supp. 2d 1006, 1016 (D. Minn. 1998) (*citing Dahlin*

*v. Fraser*, 288 N.W. 851, 852 (Minn. 1939) (emphasis added)).   "Mere words or threats

do not constitute an assault, unless accompanied by an offer of physical violence."

*Bellini v. University of St. Thomas*, 1994 Minn. App. LEXIS 806, 16-15 (Minn. App.

1994) (*quoting Johnson v. Sampson*, 208 N.W. 814, 815 (1926)).   "[T]he display of force

must be such as to cause plaintiff reasonable apprehension of immediate bodily harm."

*Dahlin v. Fraser*, 288 N.W. 851, 852 (1939).

---

[6] To the extent Bezdichek asserts a theory of negligent training, the Court should disregard her allegations. Courts have consistently recognized that Minnesota does not recognize such a cause of action. *Mandy v. 3M*, 940 F. Supp. 1463, 1474 (D. Minn. 1996) (*citing M.L. v. Magnuson*, 531 N.W.2d 849, 856 (Minn. App. 1995), rev. denied (Minn. July 20, 1995) ("Minnesota recognizes three causes of action where a claimant sues an employer in negligence for injuries caused by one of its employees: negligent hiring, negligent retention, and negligent supervision.")).

The Court should dismiss Bezdichek's claim of assault and battery as there is no evidence in the record that Defendant Vennewitz ever threatened or caused Bezdichek bodily harm. Further, the record evidence does not establish Bezdichek experienced apprehension of bodily harm based on Defendant Vennewitz's conduct. To be sure, Bezdichek would not have voluntarily attended the party on August 30th after the first alleged drunken incident.

Furthermore, this Court must find the doctrine of respondeat superior is applicable or the alleged tortious conduct of Defendant Vennewitz was *foreseeable* or within the scope of his employment to hold Defendant Hilton liable. *See Frieler v. Carlson Mktg. Group*, 751 N.W.2d 558, 576 (Minn. 2008); *see also Oslin v. State*, 543 N.W.2d 408, 414 (Minn. App. 1996). An agent acts within the scope of his or her employment when he or she:

> is performing services for which he has been employed or while he is doing anything which is reasonably incidental to his employment. The conduct must occur within work-related limits of time and place. The test is not necessarily whether the specific conduct was expressly authorized or forbidden by the principal but rather whether such conduct should fairly have been foreseen from the nature of the employment and the duties relating to it.

*Oslin*, 543 N.W.2d at 413 (*quoting Marston v. Minneapolis Clinic of Psychiatry*, 329 N.W.2d 306, 311 n.3 (Minn. 1982)).

Moreover, the alleged conduct giving rise to the claims of assault and battery did not even occur while both were working. Such conduct was not foreseeable based on their past employment relationship. Vennewitz had limited involvement with Bezdichek during working hours, was not her direct supervisor and had never been accused of such

conduct in the past.  (Bezdichek Dep. 54, 56).  Bezdichek's battery and assault claims should be dismissed.

### C.   Bezdichek's Invasion of Privacy Claim Is Not Viable.

Bezdichek alleges in Count VI that Defendants are liable for her injuries under the theory of "intrusion upon seclusion/invasion of privacy."[7]   Under Minnesota law, this claim involves: 1) "an intrusion 2) that is highly offensive and 3) into some matter in which a person has a legitimate expectation of privacy." *Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741, 745 (Minn. App. 2001).  Liability therefore depends on whether "the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable person, as the result of conduct to which the reasonable person would strongly object."  *Id*.  This is a high threshold.  As some courts have noted, the reasonable person standard applicable to this cause of action is "analogous to the ***shock the conscience analysis*** employed in substantive Due Process claims."  *Andersen v. County of Becker*, 2009 U.S. Dist. LEXIS 90158 (D. Minn. 2009) (emphasis added).

Bezdichek's allegations do not come close to "shocking the conscience" – there were two incidents of alleged touching and a few off-handed comments, most happening while the parties were heavily drinking.  Furthermore, it is nonsensical that Defendants invaded her privacy when admittedly, she continued to work with Vennewitz and socialize with him outside of work even after the first alleged intrusive conduct occurred.

---

[7] Minnesota adopted the tort of intrusion upon seclusion, in 1998. *Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741, 745 (Minn. App. 2001).

(Bezdichek Dep. 75-76).   Vennewitz's actions do not constitute invasion of privacy as a matter of law.   The Court should dismiss Count VI in its entirety.

### D.   Bezdichek's Emotional Distress Claims Are Not Viable.

Counts III and VIII allege Defendant Hilton is liable for Bezdichek's injuries under the theories of negligent and intentional infliction of emotional distress.   Both claims lack merit based on the record in this case.

### 1.   No Facts Exist To Establish a Negligent Infliction of Emotional Distress Claim.

In general, Minnesota case law allows a plaintiff to recover for negligent infliction of emotional distress ("NIED") "if the infliction of emotional distress is accompanied by a physical injury." *Smith v. Hennepin County Technical Center*, 1988 U.S. Dist. LEXIS 4876 (D. Minn. 1988) *citing  Langeland v. Farmers State Bank of Trimont,* 319 N.W.2d 26, 31 (Minn. 1982). A plaintiff who does not sustain physical injury can only recover for emotional distress when the individual was "within the zone of danger of physical impact, reasonably fears for her safety, and consequently suffers severe emotional distress with resultant physical manifestations of the emotional distress." *Id.*   (*citing Leon v. Washington County,* 397 N.W.2d 867, 875 (Minn. 1986)); *see also Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 557 (Minn. 2003).[8]   These facts do not exist.   Not only did Bezdichek not suffer physical injury, there is no evidence she

---

[8] The claim of NIED is intended to remedy "physically risky, calamitous events." *Smith v. Datacard Corp.,* 9 F. Supp. 2d 1067, 1081 (D. Minn. 1998).  Thus, to establish a claim for negligent infliction of emotional distress*,* Bezdichek must show circumstances where it was abundantly clear she was in "grave personal peril for some specifically defined period of time." *See K.A.C. v. Benson,* 527 N.W.2d 553, 555 (Minn. 1995).

reasonably feared for her safety or suffers severe distress. To the contrary, if she really feared physical harm, she would not have stayed in the same apartment with Vennewitz after her tried to touch her or met him at a party on a subsequent occasion. Furthermore, she has not sought or received psychological treatment, and, aside from some sleeplessness, has not suffered additional ill effects from these alleged acts. (*See supra* Facts Section V.).

### 2.    Bezdichek's Intentional Infliction of Emotional Distress Also Fails.

To survive summary judgment on an intentional infliction of emotional distress ("IIED") claim, Bezdichek must present evidence to show the conduct was "extreme and outrageous," "intentional or reckless," and actually caused severe emotional distress.[9] *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983). Courts routinely limit liability for IIED claims based on their unreliability as they are capable of fabrication. *Hubbard*, 330 N.W.2d at 437-38; *Carlson v. Illinois Farmers Ins. Co.*, 520 N.W. 2d 534, 535-536 (Minn. App. 1994). "If the claimed distress is of the type people commonly encounter and endure in their lives, then the claim should not even be submitted to the jury." *Wenigar v. Johnson,* 712 N.W.2d 190, 208 (Minn. App. 2006) *quoting Cafferty v. Garcia's of Scottsdale*, 375 N.W.2d 850, 853 (Minn. App. 1985). Bezdichek has not presented facts to meet this high threshold – she continues to live in

---

[9] The Minnesota Supreme Court has explained that extreme and outrageous conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to civilized community." *Hubbard* 330 N.W.2d at 439. Courts have interpreted "severe emotional distress" to mean "the law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Id*.

California, maintains a romantic relationship and friendships, and is successfully employed. (Bezdichek Dep. 239-40, 242). Even taking Bezdichek's allegations that she has become "more guarded", struggles with intimacy, and experiences headaches and stomach pains, as true, they are insufficient to show she suffers from IIED as a matter of law. [10] (*Id*.).

## **CONCLUSION**

For the foregoing reasons, Defendants Hilton Hotel Co. and James Vennewitz, request the Court dismiss Plaintiff April Bezdichek's Second Amended Complaint in its entirety.

---

[10] Several Minnesota state and federal courts have address the level of severity needed to establish a viable claim of emotional distress. Specifically, courts have held conduct is not actionable in numerous cases with even greater facts. Such opinions have established when emotional distress is not recoverable. *See Smith v. DataCard Corp.,* 9 F. Supp. 2d 1067, 1082 (D. Minn. 1998) (suffering nightmares, being tense and fearful, does not qualify as severe emotional distress); *Hubbard*, 330 N.W.2d at 440 (testimony that plaintiff was depressed, had stomach disorders, skin rash and high blood pressure was insufficient to establish severe emotional distress); *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 869 (Minn. 2003) (loss of hair, depression, the aggravation of plaintiff's eczema and diabetes, and "incessant pain in his stomach" did not establish a claim for intentional infliction of emotional distress); *Bohdan*, 411 N.W.2d at. 908-09 (paranoid disorder with brief hospitalization without causal link did not establish emotional distress); *Oswalt v. Ramsey County*, 371 N.W.2d 241, 244, 247-48 (Minn. App. 1985) (sleeplessness, nightmares, grinding of teeth, drinking, irritability, depression and paranoid behavior, isolation in relationship with spouse, and chemical dependency coupled with psychological testimony of aggravation of pre-existing post-traumatic stress disorder demonstrated the type of emotional distress which would normally and naturally flow when plaintiff lost his homestead and did not present facts demonstrating severe emotional distress).

Dated:  December 1, 2009    JACKSON LEWIS LLP


         *s/Thomas E. Marshall*
         Thomas E. Marshall  #155597
         Gina K. Janeiro #0345337
         225 South Sixth Street, Suite 3850
         Minneapolis, MN  55402
         (612) 341-8131

         ATTORNEYS FOR DEFENDANT